NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CONCHITA SMITH, | : |
| Plaintiff, | : |
|  | : Civil Action No. 04-cv-6315 (PGS) |
| v. | : |
|  | : |
| MEDPOINTE HEALTHCARE, INC., | : OPINION |
| MEDPOINTE PHARMACEUTICALS, | : |
| ANTHONY H. WILD, President and CEO | : |
| Defendants. | : |

**SHERIDAN, U.S.D.J.**

Plaintiff, Conchita Smith ("plaintiff"), terminated for missing nearly 11 months of work in a 16-month span for various reasons, allegedly in violation of defendants' company policy, filed a Complaint for age, disability, and race discrimination as well as claims under the Family and Medical Leave Act of 1993 (FMLA), Consolidated Omnibus Budget Reconciliation Act (COBRA), breach of contract, and defamation. Defendants move for summary judgment, generally, based on the legitimate, non-discriminatory reason of excessive absences for plaintiff's termination.

I.

Plaintiff, a female of Bolivian decent, 41 years of age at the time of her termination, was hired by Carter-Wallace in August 1986 as a Pharmaceutical Sales Representative. Throughout her 15-year tenure at Carter-Wallace, plaintiff was promoted to Medical Sales Representative and then to Senior Medical Sales Representative. In about 2001, Carter-Wallace was acquired by Defendant Medpointe Healthcare, Inc. (collectively, with Medpointe Pharmaceuticals and Anthony H. Wild,

referred to as "Medpointe" or "defendants"). Plaintiff was retained to work at Medpointe, with no employment contract, as an employee-at-will. While at Medpointe, plaintiff was elevated to the position of Senior Specialty Sales Representative and also held the positions of Senior Professional Medical Sales Representative and Regional Trainer. Plaintiff was assigned the territory of Manhattan where she visited various doctors' offices with medical supplies and samples.

According to the plaintiff, on July 7, 2002, while about 6 months pregnant, plaintiff fell outside of her doctor's office causing pre-term pregnancy complications.[1] Plaintiff maintained at her deposition that she was ordered by her doctors not to go back to work. On October 3, 2002, plaintiff gave birth to her third child and remained out of work. According to an internal memorandum, on November 15, 2002, plaintiff was placed on leave under the Family and Medical Leave Act. Plaintiff was authorized to return to work on December 23, 2002, however plaintiff used additional vacation time and did not return until January 2, 2003. Approximately four months later, on April 25, 2003, plaintiff injured her back in the course of her employment. This injury forced plaintiff to be out of work until October 13, 2003, at which time she was terminated.

Defendants maintain that plaintiff was terminated on account of a company policy regarding the maximum amount of leave that an employee is permitted to take. According to the policy, an employee is allowed no more than six months leave in a rolling 18-month period. Defendants contend that plaintiff exceeded the allowable leave time by her absence of 11 months over a 16-month span. Plaintiff claims to have never been given notice of such a policy, nor was she ever advised that she was in violation of the policy until after she was terminated. The policy is apparently displayed on the company's intranet site and appears to have been issued on April 1, 2002.

---

[1] At oral argument, plaintiff's counsel stated that plaintiff was hit by a car.

II.

Before delving into the substantive claims and the burden shifting frameworks required to analyze the various discrimination allegations, the Court must first address plaintiff's allegations that defendants' Leave of Absence Policy violates the FMLA. While plaintiff does not ask the Court to opine as to the validity of the policy, plaintiff argues that defendants' legitimate, non-discriminatory reason for plaintiff's termination is pretext because the policy violates the FMLA.

Pursuant to the FMLA, an employee is entitled to take a leave of absence of up to twelve weeks during any one year period for pregnancy or a serious illness, and the employer must then reinstate the employee in the same or a reasonably comparable position. See 29 U.S.C. § 2614(a)(1)(A) and (B). The policy at issue explains that the "[t]otal time away from work for any and all approved leaves shall not exceed twenty-six (26) weeks in any rolling eighteen (18) month period (excluding Military Leave). This policy is drafted so that the ceiling is 26 weeks, and so the employer has flexibility to terminate for shorter periods of time if necessary."

Plaintiff maintains that this policy violates 29 C.F.R. 825.220(c), which provides:

> An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; ***nor can FMLA leave be counted under "no fault" attendance policies***.

(emphasis added). It is argued that the time for which plaintiff was absent for the birth of her third child and preceding complications, which leave ended on December 23, 2002, was counted toward the 26 weeks of allowable leave time, in violation of the FMLA.

Defendants, however, maintain that its policy does not violate the FMLA and, in fact, is

consistent with 29 U.S.C. §2653 which provides:

> Nothing in this Act or any amendment made by this Act shall be construed to discourage employers from adopting or retaining leave policies more generous than any policies that comply with the requirements under this Act or any amendment made by this Act.

See also 29 C.F.R. §825.700. Defendants contend that its leave policy is more generous than that which is required under the FMLA.

Defendants further state that its policy is not a "no fault" policy, as contemplated by 29 C.F.R. 825.220(c), which, according to defendants, "creates a point-based system under which employees are assigned 'occurrences' for all absences and tardiness, unless the absence is one of the specified exceptions to the policy. It does not excuse unauthorized absences. The goal of this attendance policy is to reward good attendance and eliminate employees with poor attendance. Points are accumulated for each occurrence (an absence or a tardy), and after a certain number of points, disciplinary action is taken." See Defendant's Reply Brief, Pg. 6-7. However, the final regulations implementing the Family and Medical Leave Act state that "[t]he taking of FMLA leave may not be counted against the employee under the employer's attendance policy." *Rules and Regulations, Department of Labor, Wage and Hour Division, The Family and Medical Leave Act of 1993*, 60 F.R. 2180, 2227 (1995). This statement does not limit the application to "no fault" policies. Nevertheless, at oral argument, defendants maintain that their "leave policy" is not an "attendance policy." However, in attempting to clarify this distinction, counsel for defendants stated that every day an employee is not at work counts toward the policy, including vacation days. The Court sees no distinction between the defendants' policy and an attendance policy. It seems nonsensical to allow FMLA leave to count towards a policy that prohibits an employee from being absent from work for a certain number of weeks, but not count that leave towards a policy that

requires an employee to be present at work for a certain number of weeks. Defendants' distinction is unconvincing and no case law has been presented to support this interpretation.

Defendants rely upon *Gerety v. Atlantic City Hilton*, 184 N.J. 391 (2005), which held that a 26-week medical leave policy did not discriminate against pregnant women. In *Gerety*, the court considered a policy which authorized two types of leave: FMLA/NJFLA and its own medical leave policy. *Id.* at 400. The policy stated that employees were provided with 26 weeks of unpaid family and medical leave during a consecutive twelve month period. *Id.* at 393. Thus, an employee would only be entitled to one 12-week FMLA leave during that period. In *Gerety*, the plaintiff suffered pregnancy complication and was placed on FMLA leave. Upon the expiration of the 12-week FMLA period, plaintiff could not return to work and was approved for leave under the defendant's own medical leave policy. Upon surpassing the 26-week threshold, the plaintiff was terminated.

In this case, employees are provided with 26 weeks of leave in an 18-month period under a policy which considers FMLA leave and non-FMLA leave, including jury duty, vacation days, sick days, and personal leave. Further, because the policy covers an 18-month period, an employee may be entitled to two separate FMLA leaves. Complicating matters further, plaintiff was not placed on FMLA leave at the onset of her pregnancy complications and, according to defendants' characterization of plaintiff's leave, appears to have enjoyed only 5 or 6 weeks of FMLA leave (11/15/02-12/23/02).

While defendants would have this Court believe that this case is a simple matter of a policy which provides more generous leave time than that required under the FMLA, defendants are woefully mistaken. Defendants explain in its Leave of Absence Policy that its FMLA leave is based on a rolling twelve month period, one of four permissible methods for determining the "12-month

period" in which the 12 weeks of leave entitlement occurs.  See 29 C.F.R. 825.200(b).[2] Hypothetically, if an employee took 12 continuous weeks of FMLA leave starting on January 1, 2002 for the birth of a child, another 12 continuous weeks of FMLA leave starting on January 1, 2003, and was then required to appear for 15 days of jury duty upon her return in April 2003, that employee would violate the defendants' policy.  "A basic tenet of FMLA is that the employee who takes FMLA leave is to be treated no differently than if the employee had continued to work." 60 F.R. at 2227.  There is no doubt that an employee who takes FMLA leave at Medpointe is treated differently than if that employee had continued to work because that time is counted toward the Leave of Absence Policy.  A Medpointe employee who lawfully takes 24 weeks of FMLA leave during the 18-month period subject to the Leave of Absence Policy, can take no more than two weeks of time off for sick days, court mandated jury duty, personal days, vacation, or any other reason for the remainder of the 18-month span.  It is conceivable, under the policy, as written, that FMLA violations could occur.  Whether the application of the policy violated the FMLA in this instance is not so clear.  What is clear, however, is that leave taken pursuant to FMLA cannot count towards the defendants' policy, which is not a medical leave policy, as in *Gerety*, but a clear attendance policy.

As noted above, plaintiff was not placed on FMLA leave until November 15, 2002, despite the fact that she had been out of work since July 7, 2002.  At oral argument, defense counsel suggested that the internal memorandum placing plaintiff on FMLA leave as of November 15, 2002 is of no consequence because plaintiff gave birth on October 3, 2002, at which time her FMLA leave would have began, despite no affirmative election by the plaintiff to take FMLA leave on that date. However, when questioned why plaintiff was not placed on FMLA for a "serious health condition"

---

[2] "Under...the 'rolling' 12-month period, each time an employee takes FMLA leave the remaining leave entitlement would be any balance of the 12 weeks which has not been used during the immediately preceding 12 months." 29 C.F.R. 825.200(c).

in July 2002, counsel, contradictorily, offered that plaintiff did not elect to take FMLA leave at that time.[3]

While neither party seems to find the dates for which FMLA leave started and ended particularly relevant to the disposition of this matter, the Court find this inquiry to be central to resolving the issues presented. The plaintiff was out of work from July 7, 2002 through January 2, 2003 which, according to the Court's calculations, amounts to approximately 25 weeks and 4 days. Defendants concede that plaintiff was entitled to 12 weeks of FMLA leave which it unilaterally elected to run from November 15, 2002, and then at oral argument seem to suggest that the company backdated the FMLA leave to the birth of plaintiff's child on October 3, 2002.

Defendants, however, offer no credible reason for why the FMLA leave did not begin on July 7, 2002 when plaintiff suffered a "serious health condition" within the meaning of the FMLA. The start of FMLA in 2002 is significant because of the rolling 12-month period for plaintiff to take FMLA leave in 2003.[4] If plaintiff was placed on FMLA leave for 12 weeks commencing on July 7, 2002, her FMLA leave would expire on September 29, 2002 at which time she would have been placed on disability and vacation leave through January 2, 2003. Considering that "FMLA leave may not be counted against the employee under the employer's attendance policy," 60 F.R. at 2227, only

---

[3] Pursuant to 29 C.F.R. 825.302(c), "[a]n employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave. The employee need not expressly assert rights under the FMLA or even mention the FMLA but may only state that leave is needed...The employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken. In the case of medical conditions, the employer may find it necessary to inquire further to determine if the leave is because of a serious health condition and may request medical certification to support the need for such leave."

[4] Plaintiff's counsel, however, indicated at oral argument that plaintiff did not take a second FMLA leave in 2003.

the time between September 29, 2002 and January 2, 2003, a period of 13 weeks and four days, would be counted against plaintiff.

Being that plaintiff was out of work again from April 25, 2003 through October 13, 2003, had the prior FMLA leave commence on July 7, 2002, plaintiff could have been entitled to another 12 weeks of FMLA leave beginning on July 7, 2003. See 29 C.F.R. 825.200(c). In 2003, until her termination, plaintiff was out of work a total of 24 weeks and 3 days. If, in fact, plaintiff was entitled to another 12 weeks of FMLA leave beginning on July 7, 2003, which would not count towards the Leave of Absence Policy, only the time from April 25, 2003 to July 6, 2003 and September 29, 2003 to October 13, 2003 would count against plaintiff, for a total of 12 weeks and 2 days.

The time which can lawfully be counted against plaintiff in connection with the Leave of Absence Policy from 2002 and 2003 appears to equal 25 weeks and 6 days (13 weeks and four days plus 12 weeks and 2 days). According to the policy, "[t]otal time away from work for any and all approved leaves *shall not exceed twenty-six weeks*..."(emphasis added). Therefore, if plaintiff was entitled to a second FMLA leave in 2003, it is possible that she was not in violation of the policy.[5]

However, following a request for supplemental briefs concerning whether plaintiff was entitled to FMLA leave in 2003, the Court finds that plaintiff was not entitled to a second leave under the FMLA. An "eligible employee," under 29 C.F.R. 825.110(a)(2), "[h]as been employed for at least 1,250 hours of service during the 12-month period immediately preceding the commencement of the leave." Considering that plaintiff had only been working from January 2, 2003 through April 25, 2003 in the preceding 12-month period (a span of approximately 16 weeks) and Medpointe's work schedule for all sales employees is based on a 37.5 hour work week, plaintiff

---

[5] The Court notes, however, that the policy states that it "is drafted so that the ceiling is 26 weeks, and so the employer has flexibility to terminate for shorter periods of time if necessary."

could not have worked 1,250 hours so as to be entitled to FMLA leave in 2003.[6]

Plaintiff, however, makes an additional argument, for the first time, bringing up the New Jersey Family Leave Act (NJFLA). Under the NJFLA, an employee is entitled to twelve weeks of family leave "in any 24-month period." N.J.S.A. 34:11B-4. The term "employee" is defined as "a person who is employed for at least 12 months...for not less than 1,000 base hours during the immediately preceding 12-month period." N.J.S.A. 34:11B-3(e). It is plaintiff's contention, in her supplemental brief, that subsequent to her FMLA leave in 2002, which extended from July 7, 2002 to September 29, 2002, she was entitled to an additional 12 weeks of leave under the NJFLA upon the birth of her child on October 3, 2002.

Plaintiff provides no legal support for this conclusion. However, the Court's research reveals that plaintiff's argument has merit. The NJFLA is similar to the FMLA, but does not cover leave for an employee's own disability. N.J.S.A. 34:11B-3(i). The New Jersey Administrative Code, at N.J.A.C. 13:14-1.6 recognizes this distinction and expounds upon the relationship between the two laws. Subsection (a) of that section explains that "[w]here an employee requests leave for a reason covered by both the Act and another law, the leave simultaneously counts against the employee's entitlement under both laws." It is subsection (b), though, that contemplates the exact situation encountered here. The relevant portions of that subsection provides:

---

[6] Plaintiff states in her brief and reiterated through her counsel at oral argument that plaintiff was unaware of the Leave of Absence Policy issued on April 1, 2002 and posted on the intranet site. Notably, plaintiff only contends that she had no notice of the Leave of Absence Policy, as opposed to her rights under the FMLA. Moreover, in plaintiff's claim for relief, no mention in made regarding FMLA notice and/or posting requirements. To the extent such a claim in made pursuant to 29 C.F.R. 825.300 and 825.310, such an argument is rejected by this Court. See *Dube v. J.P. Morgan Investor Services*, 2006 WL 2924944 (1st Cir. 2006) (Employer's posting notice on its intranet website which was accessible to all employees while at work alerting employees of their rights and obligations under the FMLA, complied with regulatory requirement that employer post such notice).

> Medical or disability leave granted under other laws, but not granted under the [NJFLA], shall not abridge an employee's right to leave or other protections granted under the [NJFLA]. For example, the FMLA provides leave for an employee's own disability, but disability leaves are not covered by the [NJFLA]. Some situations which may arise under this example include, but are not limited to:
>
> > 1. If an employee first takes FMLA leave because of his or her own disability, including a disability related to pregnancy or childbirth, the employee would be entitled to an additional 12 weeks of leave within 24 months under the Act to care for a seriously ill family member or newly born or adopted child, because the prior disability leave was taken for a purpose not covered by the [NJFLA];
>
> > 2. If an employee takes FMLA leave because of his or her own disability, including a disability related to pregnancy or childbirth, and a family member becomes seriously ill or a child is born or adopted while he or she is still on FMLA disability leave, the intervening birth, adoption or serious family illness does not convert the FMLA leave to a leave under the [NJFLA]. For as long as the employee continues to be eligible for FMLA leave based on his or her own disability, the leave does not simultaneously count against the employee's entitlement under the Act.

N.J.A.C. 13:14-1.6(b). See also *Cluney v. MON-OC Federal Credit Union*, 2006 WL 2128985 (N.J. Sup. Ct. App. Div. 2006) (finding a situation where an employee is entitled to consecutive 12 week leaves under the FMLA and NJFLA "plausible").

In light of this section, it appears clear to this Court that plaintiff was entitled to FMLA leave from July 7, 2002 to September 29, 2002 and NJFLA leave from October 3, 2002 through December 23, 2002. Because such leaves of absences should not be counted against plaintiff, it would seem that plaintiff did not exceed the threshold absence of 26 weeks in an 18-month period. However, it is clear that the policy, under these circumstances, did not violate the FMLA, but rather the NJFLA. Plaintiff, though, failed to plead a violation of the NJFLA. Thus, this Court can only look

to the FMLA, for which leave plaintiff was clearly provided from July 7, 2002 to September 29, 2002, and for which leave plaintiff was not eligible for in 2003.

To establish a prima facie case of retaliation under the FMLA, a plaintiff must show that (1) she took an FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave. *Conoshenti v. PSE&G Co.*, 364 F.3d 135 (3d. Cir. 2004). The Court cannot find that a reasonable jury could conclude that plaintiff's termination stemmed from the FMLA leave of absence from July 7, 2002 to September 29, 2002.  Subsequent to September 29, 2002, plaintiff missed in excess of 26 weeks of work in an 18-month period, which would violate Medpointe's leave of absence policy.  It is possible that plaintiff's termination resulted from the leave taken immediately thereafter, that was protected by the NJFLA, for which no claim is made, in addition to, or in combination with, the leave taken in 2003 that was not protected. However, to suggest that plaintiff's termination in October 2003 was a result of leave taken more than a year earlier, when so much additional leave had been taken in the interim, is without merit. "With respect to temporal proximity, the Supreme Court has stated that '[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close[ ]'. '" *Schriner v. Sysco Food Service of Cent. Pa.*, 2005 WL 1498497 *12 (M.D.Pa. 2005)(quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)).

Plaintiff's absences upon her return from FMLA leave exceeded 26 weeks in an 18-month period.  Moreover, the lack of temporal proximity between the FMLA leave and plaintiff's termination is detrimental to plaintiff's claim under the Family and Medical Leave Act.  Summary judgment on this count is granted.

III.

Plaintiff has also asserted discrimination claims under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §621-34, the Americans with Disabilities Act (ADA), 42 U.S.C. §12101, et seq., and the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1, et seq.

Under the *McDonnell Douglas* line of cases, as applied to the ADEA, ADA, and NJLAD, there is a three step burden shifting process in the analysis of pretext discrimination cases. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973). First, the plaintiff must establish a prima facie case of discrimination. With regard to the ADEA and NJLAD, the plaintiff must show that she (1) is a member of the protected class, i.e. at least 40 years of age, 29 U.S.C. § 631(a), (2) is qualified for the position, (3) suffered an adverse employment decision, and (4) in the case of a demotion or discharge, was replaced by a sufficiently younger person to create an inference of age discrimination. *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 973-74 (3d Cir.1998); *Duffy v. Paper Magic Group*, 265 F.3d 163, 168 (3d Cir. 2001).

To establish a prima facie case of disability discrimination under the ADA and NJLAD, plaintiff must prove by a preponderance of the evidence that (1) she belongs to a protected class, (2) she was qualified for the position, (3) she was dismissed despite being qualified and (4) she was ultimately replaced by a person sufficiently outside the protected class to create an inference of discrimination. See *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 68 (3d Cir. 1996); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 897 (3d Cir. 1987); *Clowes v. Terminix Intern., Inc.*, 109 N.J. 575, 596-97 (1988).

Under each of the aforementioned tests, including the NJLAD for racial discrimination[7], upon successfully establishing a prima facie case, the burden shifts to the defendants "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir.2000); *English v. PNC Bank*, 157 Fed.Appx. 501 (3d Cir. 2005); *Andersen v. Exxon Co., USA*, 89 N.J. 483, 492-93 (1982). If defendants meet this burden, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendants are merely a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804-5. The ultimate burden of persuading the trier of fact that defendants intentionally discriminated against her remains at all times with the plaintiff. *Holodak v. Rullo*, 2006 WL 3227785 (3d Cir. 2006).

Assuming *arguendo* that plaintiff has established a prima facie case under the ADA[8], ADEA, and NJLAD, defendants maintain that the legitimate, non-discriminatory reason for the plaintiff's dismissal was her violation of the Leave of Absence Policy. However, this Court's previous findings that the policy could violate the NJFLA and/or FMLA and that plaintiff may not have, in fact, violated the policy, does not satisfy the plaintiff's burden. The Third Circuit has held that "it is not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue

---

[7] To make out a prima facie case of discriminatory discharge under the NJLAD, a plaintiff must show that (1) she is a member of a protected class, (2) she was performing her job at a level that met her employer's legitimate expectations, (3) she was terminated, and (4) she was replaced. *Clowes*, 109 N.J. at 538.

[8] However the Court questions whether plaintiff was "disabled" or "qualified" under the ADA. See *DeJoy v. Comcast Cable Communications*, 968 F.Supp. 963 (D.N.J. 1997)("The ADA does not apply to 'transient, nonpermanent condition[s].'"(citations omitted); *Walton v. Mental Health Assoc.*, 168 F. 3d 661, 671 (3d Cir. 1999); see also *Waggoner v. Olin Corp.*, 169 F.3d 481, 482 (7th Cir.1999)("The rather common-sense idea is that if one is not able to be at work, one cannot be a qualified individual."); *Byrne v. Avon Products, Inc.*, 328 F.3d 379 (7th Cir. 2003).

is whether the employer acted with discriminatory animus." *Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 283 (3d Cir.2001). As explained in *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir.1994):

> the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the...plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employers's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] nondiscriminatory reasons."

*Id.* at 765 (citations and emphasis omitted).

Plaintiff has presented no evidence or suggestion that the reasons for the termination were discriminatory. "Nothing in the record plausibly suggests that the proffered reasons for [plaintiff's termination] were...actually motivated by discriminatory animus." *Snik v. Verizon Wireless*, 160 Fed.Appx. 191, 194 (3d Cir. 2005). As such, plaintiff has failed to satisfy her burden to demonstrate that the legitimate reasons offered by the defendants are merely a pretext for discrimination. Therefore, plaintiff's claims under the ADA, ADEA, and NJLAD must be dismissed.

IV.

The Consolidated Omnibus Budget Reconciliation Act (COBRA) requires a health plan administrator to provide sufficient notice of COBRA rights to a covered employee and qualified beneficiaries who would lose coverage under the plan as a result of a qualifying event. See 29 U.S.C. § 1161. Upon the occurrence of a "qualifying event," "the employer of an employee under a plan must notify the administrator...within 30 days...of the date of the qualifying event[.]" See 29 U.S.C. § 1166(a)(2). The administrator then must notify any qualified beneficiary of his COBRA rights within 14 days of the receipt of notification from the employer. See 29 U.S.C. § 1166(a)(4)(A) &

(C). ERISA gives the aggrieved COBRA beneficiary a cause of action if a plan administrator fails to provide the required notice in either of these two circumstances. See 29 U.S.C.A. § 1132(c)(1)(A).

To meet this notice requirement, an employer must make a good faith attempt to notify the beneficiaries, but is not required to ensure that notice is actually put in the possession of the beneficiary. *DiSabatino v. DiSabatino Bros., Inc.*, 894 F.Supp. 810, 817 (D.Del.1995); *Farrell v. Astrazeneca Pharmaceuticals LP*, 2005 WL 2122678 (D.Del. 2005). Generally, mailing a notice to an employee's last known address constitutes a good faith effort at notification; no requirement has been imposed on the employer to ensure that the notice was received. See *Vanderhoof v. Life Extension Institute*, 988 F.Supp. 507, 518 (D.N.J.1997) (finding that defendant's mailing of COBRA notice satisfied requirement); *Truesdale v. Pacific Holding Co./Hay-Adams Div.*, 778 F.Supp. 77, 81 (D.D.C.1991) (finding that notice mailed to the proper address is considered received).

Although plaintiff, at oral argument, does not dispute that she received all the benefits to which she was entitled under COBRA, it was maintained at her deposition that she did not receive notification of her rights under COBRA following the qualifying event of her termination. It is alleged that plaintiff was only advised of her right to continuing coverage when she personally contacted COBRA.

Defendants, however, offer an October 24, 2003 letter, from AETNA, the plan administrator, to the plaintiff advising plaintiff of her rights under COBRA. As stated above, 29 U.S.C. § 1166(a)(2) required Medpointe to notify AETNA within 30 days of plaintiff's termination. In turn, AETNA thereafter had 14 days from receipt of such notification to advise plaintiff of her rights under COBRA. 29 U.S.C. § 1166(a)(4)(A) & (C). Plaintiff, on her own accord, contacted the plan administrator to obtain information on her rights under COBRA. Even had Medpointe contacted the AETNA on the day plaintiff was terminated, AETNA was permitted 14 days, or until October 27,

2003, to notify plaintiff of rights.  The letter was sent on October 24, 2003.  Whether this letter was prompted by plaintiff's inquiry or subsequent to Medpointe's required notification to the plan administrator pursuant to 29 U.S.C. § 1166(a)(2), plaintiff was timely provided with her notification of rights under COBRA.

Therefore, summary judgment is granted, dismissing this claim.

V.

In addition to plaintiff's concession to dismiss her common law claims for breach of contract and defamation, summary judgment is granted as to plaintiff's claims under the FMLA, ADA, ADEA, NJLAD, and COBRA.  Plaintiff's Complaint is dismissed with prejudice.


February 15, 2007                                          S/ *Peter G. Sheridan*
                                                               PETER G. SHERIDAN, U.S.D.J.